JUNE TERM, 1869.    143

Knorr vs. The Home Insurance Company of New York.

KNORR vs. THE HOME INSURANCE COMPANY OF NEW YORK.

*Corporation — Citizenship — Transfer of cause to federal court.*

The fact that an insurance company, created by the laws of another state, does business in this state in conformity to its laws regulating the transaction of insurance business by foreign companies, and that its agents here are authorized to accept service of process from our state courts, does not deprive it of the right to transfer to the federal courts (under the 12th section of the judiciary act of 1789) a suit commenced against it in a court of this state and by a citizen thereof.

(PAINE, J., is of opinion that so much of the judiciary act as provides for the transfer of causes from the state courts to the federal courts is invalid. COLE, J., though of the same opinion, acquiesces in the application of the act to this cause, to save loss and embarrassment to the parties. DIXON, C. J., holds the act valid.)

APPEAL from the Circuit Court for *Sheboygan* County.

This action was brought in March, 1868, to recover the sum of $1,075, with interest, etc. The summons was

served upon one Jones, an attorney and agent of the defendant, who appeared in the action as such attorney, and tendered the bond required, and applied, by verified petition, for a removal of the cause to the circuit court of the United States for the district of Wisconsin, upon grounds stated in the opinion, *infra*. The application was denied, and the defendant appealed.

[The briefs of counsel upon the first argument of the cause, and those filed upon a re-argument, are here combined.]

*J. W. & A. L. Cary*, for the appellant, as to the right of removal from a state to a federal court, under the judiciary act, cited *Gordon v. Longest*, 16 Pet. 97; *Kanouse v. Martin*, 15 How. (U. S.) 198; *Green v. Custard*, 23 id. 484; *Shelby v. Hoffman*, 7 Ohio St. 450; *Robinson v. Potter*, 43 N. H. 188; *James v. Thurston*, 6 R. I. 428; *Hill v. Henderson*, 6 S. & M. 351; *Ogden v. Baker*, 1 Green (N. J.) 75; *Durand v. Hollins*, 3 Duer, 686; *Vandevoort v. Palmer*, 4 id. 677; *Redmond v. Russell*, 12 Johns. 153; *Jackson v. Stiles*, 4 id. 493. To the point that defendant was a citizen of New York, and not of Wisconsin, they cited and commented on *Louisville R. R. Co. v. Letson*, 2 How. (U. S.) 497; *Stevens v. Phœnix Ins. Co.*, 24 How. Pr. 517; *Ohio & Miss. R. R. Co. v. Wheeler*, 1 Black, 286; *Bank of Augusta v. Earle*, 13 Peters, 519; *Marshall v. B. & O. R. R. Co.*, 16 How. (U. S.) 314; *Dennistoun v. R. R. Co.*, 1 Hilt. 62.

*Joseph Wedig*, for respondent, contended that defendant, being a corporation, had no rights of a *citizen*, except such as are specially conferred by statute. 2. That defendant's corporate existence and rights in this state were derived from the legislative power of this state, and therefore it must be regarded as subject to the judicial power of the state. 3. That congress has no power to provide for the removal of a cause from a state to a federal court. *Moseley v. Chamberlain*, 18 Wis. 700.

*E. Fox Cook*, on the same side, cited *Stevens v. Phœnix Ins. Co.*, 24 How. Pr. 519, 520; *Louisville R. R. Co. v. Letson*, 2 How. (U. S.) 558; *Ohio & Miss. R. R. Co. v. Wheeler*, 1 Black, 297; and argued that, in consideration of the privileges received from the state, it was competent for the defendant, by its president and secretary in behalf of the corporators, to contract with this state, and to agree, as it did, to submit to the judicial power of this state in all suits growing out of its corporate business with it, and with any of the inhabitants thereof. 2 Term, 661; *Mayor of Linn. v. Turner*, Cooper, 86; 3 Hill, 612; 4 Gill & J. 1; 16 N. Y. 171; 5 Bing. 91; 3 Barn. & Ad. 77; 1 Bing. (N. C.) 222; 1 Term, 784.*

COLE, J. This is an application on the part of the defendant company for an order directing that this cause be removed to the circuit court of the United States for the district of Wisconsin for trial. The application seems to be regular and in conformity to the law of congress upon that subject. The petition states that the defendant "is, and for more than two years last past hath been, a corporation created by, organized and existing under, the laws of the state of New York, having its principal business office in the city of New York, and is a citizen of the State of New York," and that the plaintiff is a citizen of this state.

---

* Chapter 179 Laws of 1867, entitled "An act to regulate insurance companies not incorporated by the state of Wisconsin," after requiring a certain statement to be made, under oath, each year, by the president and secretary of each company proposing to do business in this state, adds: "Which statement shall be filed in the office of the secretary of state, together with a written instrument, duly signed and sealed, agreeing that any agent or agents of such company in the state of Wisconsin may be served with process, and authorizing any agent or agents of such company in the state of Wisconsin to acknowledge service of process for and in behalf of such company, and consenting that service of process, mesne or final, upon any such agent or agents, shall be taken and held as served upon the company, according to the laws of the state of Wisconsin, or the laws of the state by which such company may have been chartered, and in which such company is located, and waiving all right of error by reason of such service, or acknowledgment of service."

A re-argument of the cause was ordered at the last term, upon the point whether the defendant, by complying with the laws of this state regulating foreign insurance companies, did not, to a certain extent, lose its citizenship, and become a domestic corporation, so that the circuit court of the United States for this district could not take jurisdiction of the cause. In our examinations our attention was called to the cases of *Stevens v. The Phœnix Insurance Company* (24 How. Pr. 517), and *New York Piano Co. v. New Haven Steamboat Co.* (2 Abb. Pr. [N. S.] 358), where quite analogous questions were raised and considered. In *Stevens v.' The Phœnix Insurance Company*, Mr. Justice ALLEN, at special term, gave quite an elaborate opinion, upon a motion by the defendant to remove the cause to the circuit court of the United States for the northern district of New York, upon the ground that the plaintiff was a citizen of the state of New York, and the defendant was a corporation created by the laws of Connecticut and located and doing business in that state. And he held that a foreign insurance company, created by the laws of another state, but doing business in New York under and in compliance with the laws of that state, upon being sued by a citizen of New York could not remove the cause into the federal courts on the ground that it was a citizen of another state within the meaning of the clause of the constitution which confers jurisdiction upon the courts of the United States by reason of the citizenship of the parties. He states, in substance, as a reason for this conclusion, that while a foreign corporation cannot migrate or have any extra-territorial existence by force of the law creating it, yet it may, by the comity of other states, transact business in such states, establish agencies therein, sue and be sued, etc.; and that, when a corporation did avail itself of this comity, and of privileges thus conferred, in respect to the transaction of business, as to the business thus transferred it lost its citizenship, and became to that ex-

tent a citizen of the state under whose laws it transacted its business, and of whose governmental protection it availed itself.    Another reason is given, that the company, by consenting to do business under and by authority of the laws of New York regulating foreign insurance companies, submitted itself to the jurisdiction of the courts of that state.

In the case of the *Piano Co. v. New Haven Steamboat Company*, ROBERTSON, C. J., held, that a corporation will not be deemed a non-resident of that state, although chartered by the laws of another state, if it has a regular place of business within the state in which the action is pending, and has there an agent upon whom, by law, process may be served, and who has agreed to admit service of process.    He held that the locality where the principal part of its business is done, and where it exercises those functions of a corporation in the mode in which its existence is actually made known to the public, furnishes the best test to determine the citizenship of a corporation.

The reasoning of both these cases is fully met and quite satisfactorily answered in the cases of *Dennistoun v. New York & New Haven R. R. Co.* (1 Hilton, 62), and *Fisk v. the Chicago, Rock Island & Pacific R. R. Co.* (3 Abb. Pr. [N. S.] 454). And if one concedes the validity of the twelfth section of the judiciary act, and adopts the rule laid down in the more recent decisions of the supreme court of the United States in respect to the criterion by which the citizenship of a corporation is to be determined, for the purposes of jurisdiction, the doctrine of these cases last cited would seem to rest upon the better grounds.    For it is difficult to perceive why a different result should follow in case of a foreign corporation doing business through agents in another state, even though such agents might be authorized to acknowledge service of process on behalf of the corporation, than in case of a natural person.    It is very manifest that a citizen of another state might transact busi-

ness here through his agents, and still remain a non-resident. And if he should happen to be sued while temporarily within the jurisdiction of our courts, the fact that he was transacting business in the state would not probably be relied on to show that he had lost the right to transfer the cause to the federal courts. It is very true that a foreign insurance company, on complying with our laws upon that subject, is permitted to take risks and transact the business of insurance in this state. That is, it is permitted to exercise here the powers conferred upon it by the state which incorporated it. But it transacts this business by means of agencies, as a non-resident person would do. The corporation is, however, not created by the law of this state. This state merely recognizes it as an already existing corporation, authorized by the sovereignty which created it to transact the business of insurance. And it is very apparent that the defendant corporation was organized and created by the law of New York, and not by the law of this state. That state alone confers upon it whatever powers it possesses under its charter. That state may at any time withdraw that charter, or otherwise dissolve the corporation, and, from the time it should do so, the corporation would cease to exist. It would no longer have the right to transact business of insurance in this state. These considerations clearly show that our laws relating to foreign insurance companies do not confer upon such companies any corporate powers, or render them domestic corporations. These laws do not, in any manner, attempt to create such corporations, and are only intended to regulate them, and prescribe upon what conditions they may do insurance business in the state. Nor does the fact that they are required to have agents here, who are authorized to acknowledge service of process for and on behalf of the company, affect the question of their citizenship, or render them domestic corporations. This is evidently a provision to relieve our

citizens from the necessity of resorting to the courts of
the state which creates the corporation, to enforce their
contracts. They may pursue their legal remedies against
such corporations in our own courts, the means and way
having been provided for obtaining jurisdiction over
them. But this does not, deprive the company of the
right, conferred upon it by the judiciary act, to apply
to have the cause removed from the state court to the
federal courts. And touching the question of the juris-
diction of the federal courts by reason of the citizenship
of parties, the more recent doctrine of the supreme court
of the United States is, that a suit by or against a corpo-
ration, in its corporate name, is to be regarded as a suit
by or against a citizen of the state which created the cor-
poration. *Ohio & Miss. R. R. Co. v. Wheeler*, 1 Black,
286. Within that rule, the defendant is undoubtedly to
be treated and regarded as a citizen of the state of New
York. As stated by the chief justice, in the case of
*Moseley v. Chamberlain* (18 Wis. 700), I have always
been of the opinion that congress has no power to pro-
vide for the removal of a cause from a state to a federal
court, and, consequently, that the twelfth section of the
judiciary act is invalid. I shall not, however, attempt
to give any reasons for that opinion at this time. Suffice
it to say, as that opinion was maturely formed, after all
the examination and reflection I could bestow upon the
question, it remains unchanged. But my adhering to
that opinion now would be of no earthly advantage, that
I can see, to any person or any principle. On the con-
trary, it would only be productive of great embarrass-
ment, trouble and expense to these parties, and others
similarly situated. For we well know that the supreme
court of the United States, in the exercise of that juris-
diction which it assumes, would pronounce all the pro-
ceedings in the state court, after the application for
removal was made, as *coram non judice*.

I have, therefore, concluded to hold, with the chief

justice, that the order of the circuit court must be reversed, and the cause remanded, with directions to grant the order of removal.

PAINE, J., *dissenting.* Before I came upon this bench, this court, as then constituted, had denied the appellate jurisdiction of the supreme court of the United States, by refusing to allow a return to be made to its writ of error in the *Booth Case.* I had examined the subject, and had come to the conclusion that, as an original question, and according to the true principles of interpretation, that action of this court was correct, although contrary to the decision of the supreme court of the United States, which had been generally acquiesced in by the state courts. That was at a time when the decisions of that court were rapidly tending toward the broad and fatal doctrine that slavery was legal wherever the constitution of the United States extended. This doctrine I believed to be so gross and enormous a perversion, not only of the spirit, but of the letter, of the constitution, so alarming and revolutionary in its effects, that I felt that the free states would be justified in pressing to the very verge of their reserved powers to oppose it by legal forms, and, if necessary, to pass beyond them and resist it by actual revolution. It is true that it was under such circumstances that I first examined the question of the appellate jurisdiction. But I endeavored not to allow my feelings, or my apprehensions as to results, to affect my judgment upon the legal question of interpretation. Still I am aware how easily and unconsciously men often fail in such efforts.

And the counsel who argued this case seemed to suppose that those members of this court who had denied the appellate jurisdiction had been influenced, in arriving at that result, by their feelings in respect to the peculiar condition of the country at that time upon the slavery question; and it was suggested, that, inasmuch as

that condition of things had passed away, the court should now acquiesce in that jurisdiction, in accordance with the general current of authority.

Influenced somewhat by this suggestion, I have reëxamined the question. I have read again the argument of the supreme court of the United States in favor of this appellate jurisdiction, and the argument of the court of appeals of Virginia against it, the latter being supported and illustrated by the subsequent opinions of Chief Justice BARTLEY of Ohio, and of the supreme courts of Georgia and California. And, as a question of pure legal interpretation, I am still of the opinion that the reasoning of the state judges against the jurisdiction has never been answered. I do not propose to repeat their arguments, and little, if any thing, could be added to them.

But the subsequent historical developments of the question, and of the general relations between the states and the federal government, and subsequent adjudications by the supreme court of the United States concerning the principles governing those relations, furnish some considerations that may properly be referred to in further illustration of their position.

It is obvious that this question constitutes the sole ground of any legitimate controversy upon the vexed subject of state rights. To say that the states have the right to continue to exercise the reserved powers is a general proposition that would never be controverted by any one. But when we reach the question, Who is to judge for both parties what powers are reserved? we approach ground upon which the probability of collission is imminent. If this appellate jurisdiction exists, if the judicial systems of the states and the federal government were, by the constitution, blended into one, holding to each other the relations of inferior and superior tribunals, then there is no room left for controversy. Whenever any question of difference arose,

the judgment of the supreme court would put an end to it legally. It would be as undisputed that the state must relinquish the power which that judgment held not to have been reserved, as that it might continue to exercise the powers which, in the judgment of the court, were reserved. Under such a system it would be as inappropriate to dignify any claims which the state might assert, by the title of state rights, as it would be in a single state to speak of county rights or town rights.

But if, under our system, where the powers of sovereignty are divided between the federal and state governments, this jurisdiction does not exist, then no common arbiter has been provided to decide conclusively for both such questions of difference as may arise concerning the delegated and reserved powers. It would then be proper to speak of state rights as such, for the states would then hold the reserved powers by a tenure as valid as that by which the federal government holds the delegated powers. The powers of neither could be wrested from it by the judgment of the other. And this is all that the idea of state rights, properly understood, ever involved. It asserts no claim that the judgment of the state tribunals is at all binding upon the federal government, upon questions involving their respective powers. It claims only that the judgments of the federal court are alike inefficacious to bind the state.

I am aware that the idea of state rights is at present exceedingly odious and unpopular. It is branded as a legal and political heresy, and held directly responsible for the attempt at secession with all its disastrous consequences. But the two claims are entirely distinct and dissimilar.

Secession is revolutionary ; state rights not. Secession seeks to withdraw and overthrow the powers admitted to have been delegated to the federal government. State rights makes no such effort. Secession throws off entirely all obligation under the constitution of the

United States.    State rights throws off none of that obligation, but concedes that that constitution and laws made in pursuance of it are the supreme law of the state, and that it is the sworn duty of its tribunals to regard and enforce them as such.

The difference between the two claims is, therefore, broad and obvious.    And the fact that the section of the country which has most prominently advocated the theory of state rights is the one which also attempted secession, can have no just tendency to confound the two, or to hold the former doctrine responsible for the consequences of the latter.    The fact that those who assert a right under a government may afterward resort to revolution in support of it, does not make the legal assertion of it revolutionary or justly responsible for the revolution.  And it is worthy of remark in this connection, that the attempt at secession was not in consequence of any difference of opinion between those states and the federal supreme court in respect to their rights as to the institution of slavery under the constitution; for the judgments of that court not only kept pace with, but anticipated, their most extravagant demands in that direction.

It is natural enough, in view of our late rebellion, that the tendencies in the popular, and perhaps in the legal, mind should be toward a strong assertion of federal power; and that those who were advocates of state rights, when the northern states were turned into hunting ground for fugitive slaves, and the entire people of the north required to become slave hunters, by the laws of congress, which were sustained by the federal court, without a syllable in the constitution conferring any authority upon congress to legislate at all upon the subject, should now be ready to brand the doctrine as a pestilential heresy.    But these fluctuations in the popular feeling and opinion can have no legitimate influence upon the question of legal interpretation.    Nor can

they make it true, that, under our system of divided sovereignty, it is not a question of the gravest delicacy and importance, and, at least, of doubt, whether the states, the original sovereignties, hold their reserved powers wholly subject to the judgment of the federal court.

That it is a question between sovereignties is conceded. Not absolute sovereignties, but governments between which the powers of sovereignty are divided, and each sovereign within its own sphere. In the bank case, the supreme court of the United States said: "In America the powers of sovereignty are divided between the government of the union and those of the states. They are each sovereign with respect to the objects committed to it, *and neither sovereign with respect to the objects committed to the other.*" This fact, in connection with the other, that the power in question is nowhere found expressed in the constitution, but, if it exists at all, must be derived entirely from inference and implication, is certainly sufficient to rescue those who make the claim of state rights, in the sense in which it has been before defined, from any charge of mere folly or presumption.

The question being of this high character, it is certainly something against the existence of this appellate jurisdiction, that it is not found anywhere distinctly expressed in the constitution. It would seem that a matter of such grave and vital moment, if provided for at all, would have been expressly provided for and regulated.

And it is not only not expressly provided for, but the inference by which it is attempted to be sustained is neither a necessary nor even a natural one. The constitution of the United States established a judicial system of its own. The article upon the subject does not refer to nor purport to regulate any other judicial system. It provided that the judicial power of the United States should be vested in one supreme court, and in such inferior courts as congress might establish.

It provided that in certain of the cases to which the judicial power extends, the supreme court should have original jurisdiction ; and in all the others "appellate jurisdiction both as to law and fact, with such exceptions and under such regulations as the congress shall make." And in the opinions of the state courts before referred to, particularly in those of the court of appeals of Virginia, and the able and exhaustive discussion by Chief Justice Bartley, of Ohio, it was demonstrated, I think, that, by every rule of interpretation, the appellate jurisdiction there provided for related only to appeals from the inferior tribunals of that judicial system. As a part of the argument, it was shown that if it was held to be applicable also to the state tribunals, it necessarily involved a power on the part of congress and the appellate court, for the purpose of regulating and enforcing the jurisdiction, which it was conceded did not exist, and could not without destroying the independence and existence of the state governments.

This argument seems to me one of controlling force. If this provision was applicable to the state courts, it necessarily involved a power in congress to regulate the proceedings in the inferior tribunal, so as to give full effect to the appellate jurisdiction both as to law and fact, and also a power on the part of the appellate court to enforce its directions, orders and judgments upon the inferior, by all the usual and established means, including commitment for contempt in case of refusal to obey.

The force of this argument is not to be tested upon the assumption that the legislation heretofore enacted, and the means heretofore used, by the supreme court to enforce this jurisdiction, have gone to the extent of the power that may be employed against the state tribunals, if it is applicable to them at all. On the contrary, it may well be doubted whether, in that event, these means have not fallen so far short of what the subject

and the occasion demanded, as to have been really incompatible with the dignity of the government of the United States. The position being once arrived at, that the constitution established this appellate power over the state courts, it seems hardly adequate to the enforcement of a due respect for the high powers committed to the federal government, for congress to provide, that, where the state tribunal refuses to obey the mandate of the supreme court, the latter may devise some other mode for executing its decrees, or for that court, when the inferior tribunal refuses to obey its process, to shrink from enforcing obedience, and exercise its jurisdiction upon a mere private copy of the records.

The strength of the argument, therefore, is not to be tested by what has been, but by what may be, done under this power. And there can be no doubt that under it congress might adopt the most extensive regulations of proceedings in the state courts, so as to insure a review both upon fact and law, and that the supreme court of a state might be committed to prison for contempt in refusing to obey the directions of the supreme court of the United States, and the state government thus virtually dismembered and destroyed, by being deprived of one of its coördinate departments.

Such a result would be in violation of principles of constitutional law, establishing the independence and exemption of the state governments and their departments from any coercion by the federal government or its departments, that have been fully recognized by the supreme court. The state of Kentucky asked of that court a *mandamus* to compel the governor of Ohio to deliver up a fugitive from justice under the law of congress. The court held, that, although it was the duty of the governor, there was no power to compel its performance. It said: "The act does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the executive of the

state, nor is there any clause or provision in the constitution which arms the government of the United States with this power. Indeed, such a power would place every state under the control and dominion of the general government, even in the administration of its internal concerns and reserved rights. *And we think it clear that the federal government, under the constitution, has no power to impose on a state officer as such any duty whatever, and compel him to perform it.*" 24 How. 107.

It is impossible to reconcile this position, which is clearly correct, with the one that the constitution intended to establish this appellate power over the state courts. Such an appellate power, if put to the test, loses its vital efficacy unless accompanied with the power of regulation and compulsion over the inferior tribunal. And whatever shifts congress and the supreme court may have resorted to, to avoid carrying their doctrine to its logical results, there can be no doubt, as a question of interpretation, that, if the constitution grants the power at all, it grants it with all the means essential to its complete execution.

Those opinions also show, by reasoning that seems to me unanswerable, that full effect is given to the general provision, that "the judicial power shall extend to all cases at law and in equity arising under the constitution, the laws of the United States," etc., when it is held that the party having the option of bringing any one of those suits may bring it in the federal court.

Certainly, such would be the construction of similar language found anywhere else. This state has, in several instances, conferred civil jurisdiction to a limited extent on the county courts. Suppose a law should be passed for that purpose, and should provide that the jurisdiction of the county court of a particular county should extend to all cases at law and in equity, where the amount in controversy did not exceed a certain sum. Would it be contended for a moment that such language could be

construed, either as depriving the circuit court of that county of concurrent jurisdiction over the same class of cases, or as giving the county court any power, by appeal or otherwise, to get jurisdiction of such a case first brought in the circuit court? Most certainly not! And yet such a construction would not seem so inadmissible, where both the courts belong to the same judicial system, as it is, in construing the constitution of the United States, to make the same language the basis of extending an appellate jurisdiction over the courts of another judicial system, organized under another constitution of government. The plain object of such a provision is to give authority in law to bring the specified cases in the federal court; not to require that, in fact, every such case should, in some mode or other, absolutely get there. Even those who support the construction which derives the appellate jurisdiction from this language would not insist upon the latter literal effect.

Suppose a plaintiff should bring an action in a state court, in which he claimed some right under a law of congress, and the highest court of the state should decide against that right. This would present a case to which, by the constitution and judiciary act, the judicial power and the appellate jurisdiction would extend. But suppose the party did not choose to appeal. There would be a case to which the judicial power extended, which it could not reach in fact. But it will be said, that, inasmuch as the party had the right to appeal, the constitutional provision was satisfied, because the case might, in law, be carried to the federal court. But if this is a good answer, as it is, undoubtedly, then it is a good answer to this whole argument to say that the constitutional provision was fully satisfied by the option of the party to have brought his suit in the federal court in the first instance. Where the party bringing the suit has that option, the judicial power of the United States extends in law to the case, and it is an unwarrantable construc-

tion to assume that it must be absolutely extended to it, in fact, without regard to the question whether the party suing exercises his option to bring it in the courts of another judicial system having concurrent jurisdiction. And it will appear evident on a close examination of this theory, and of the provisions of the laws of congress on the subject, that the object is not merely to give effect to the constitutional provision, which, as we have seen, is fully satisfied when the party bringing the suit has the option to bring it in the federal court, but to give effect to certain views of policy founded in distrust of the fairness and fidelity of the state tribunals, and which make it necessary to go far beyond what was necessary to give full effect to the constitution, and extend the option to the particular party who is supposed to stand in need of the superior fairness and exemption from local prejudice of the federal court. And the accomplishment of this object leads necessarily to the inconsistency of holding that the judicial power of the United States does not extend to the case, though the party bringing the suit might have brought it in the federal court; but that it does extend to the case whenever the party supposed to stand in need of the protection of that court has the option to take it there, either by removal or appeal, without regard to the question whether he actually exercises that option or not.

That this legislation had its origin in such views of policy, merely, is apparent from the fact that, instead of providing for a fair review by either party dissatisfied with the decision of the state court, the judiciary act confines the right of review entirely to cases where the decision of the state court is against the right claimed under the constitution or laws of the United States.

But the great argument in favor of the jurisdiction is one of policy rather than of interpretation, founded upon the extreme necessity of some common arbiter between the two governments, to decide authoritatively

for both upon the extent of the powers of each. Considered as a question of policy, this argument is unanswerable. There ought to be such an arbiter. If none was provided, it was undoubtedly a serious defect in the system. If one was provided, it was still a serious defect that it was done in such a manner as to leave room for all the doubt and uncertainty that have since existed upon the subject.

This great apparent necessity has been relied upon to show that men so wise as those who framed the constitution must have intended, by the provisions that have been considered, to establish such an arbiter. The argument is fair and forcible, but at the same time not conclusive. For it is obvious that there was the same necessity for an appellate jurisdiction and a common arbiter in another direction, in which, it is conceded, none were provided. Both judicial systems administer the state constitutions and laws over the same people and territory. And it is apparent that the same evils, the same lack of uniformity of decision, and the liability to collisions, might result from the absence of a common arbiter, as in a similar attempt by both to administer the federal laws. Yet there is no appeal from the federal to the state courts upon those questions, relating, as they do, to matters over which the state is admitted to be sovereign and supreme. And if the framers of the constitution left us liable to conflict and collision from the attempt by two judicial systems to administer, over the same territory and people, the laws of the one government, it is not so utterly improbable that they may have hazarded the same results from a similar attempt to administer the laws of the other, without any common arbiter.

The fact that the federal courts have professed to adopt and follow the decisions of the state courts as authoritative, in the construction of state laws, makes no difference. If they have done so, they have done it

Knorr vs. The Home Insurance Company of New York.

voluntarily, and without any power on the part of the state to compel such conformity. And it cannot be assumed that, while it would be wholly unsafe to trust the interests of the federal government to the action of the state courts, without the power of enforcing conformity by appeal, it would still be entirely safe to trust the interests of the state to the voluntary action of the federal tribunals. For the truth is, that, while the latter may have, in general, practiced upon the rule of following the state decisions upon state laws, they have occasionally violated it, and seem recently to have discarded it altogether.

As an illustration of the truth of the assertion that they have occasionally violated it, reference may be made to the case of *Williamson v. Berry*, 8 How. 495. In that case, the supreme court, in determining the question of jurisdiction in a judicial proceeding before the chancellor of New York, which depended wholly upon the laws of that state, disregarded the decision of the highest court of the state upon the very question, and held the proceeding before the chancellor void for want of jurisdiction, though drawn in question collaterally. There was furnished an ample opportunity for collision, in the attempt to enforce the rights of the claimant under the proceeding in the state court, and of the one claiming under the judgment of the federal tribunal.

So in the cases from the state of Iowa which have recently attracted so much attention, involving the validity of certain municipal bonds, depending for their validity solely upon the state law, that court disregarded the decisions of the state court then in force. It is true, this was done upon the ground that, by prior decisions of the state court in force at the time of the bonds were issued, they were valid. This seems to involve the principle, that, where a decision of the state court is overruled, it is, nevertheless, to be regarded as having been, not only binding in the case in which it was made,

Vol. XXV.—11

but as the general law of the state down to the time when it was so overruled — a proposition novel in the law, at war with all the reasoning upon which the maxim of *stare decisis* has been established, and which places a change of decisions by a court upon the same footing with a change of the law by a legislature.   According to the ideas that have ordinarily prevailed on this subject, the fact that there was such a prior decision ought to have constituted a controlling reason with the state court against a change; and this upon the very ground that a change necessarily uprooted all transactions which depended for their validity on the construction previously given.   But it was for the state court to decide the matter according to its own judgment and conscience.   And whether it was right or wrong, it furnished no warrant for the federal court to attempt to impose any restrictions upon the liberty of the state court to change its decisions, by inventing new and unheard of theories as to the effect of such change.

If such a precedent is established, the states may begin to inquire whether questions involving their reserved and sovereign powers are not of as grave moment as the validity of private contracts between individuals.   And they may be led to inquire whether it is possible, on the strength of prior adjudications, to save any portion of their sovereignty over the navigable lakes and rivers of the country above tide water, which, having been conceded by the universal judgment of the bar of the country, and by the decisions of the supreme court of the United States itself for more than fifty years after the formation of the government, is now being swept to destruction by recent changes in the decisions of that court.

They might also, doubtless, be led to remember that by its former decision a federal court would have had no jurisdiction at all in these very bond cases, in which they have now been imprisoning the municipal officers

of the state, on whose freedom and ability to act it may have depended for the collection of its revenues, and its ability to discharge its civil and political functions.

In *Havermeyer v. Iowa County*, 3 Wall. 294, that court disregarded the decisions of this court upon the question whether the law under which the bonds there involved were issued was a general law, within the provision of our constitution that no general law should be in force until published. It applied in that case the doctrine on which it had acted in the Iowa case, without any previous decision by this court on which to rely. For, although there had previously been a case in this court in which it was assumed that such an act was a mere private act, and a question made only whether as such it was sufficiently pleaded, the court of the United States expressly says, in its opinion referring to it, "the question whether it was a private act was not made in the case." And therefore, by all the established principles applicable to the subject, it was no decision and no authority upon the question. It served for no higher purpose than, as the supreme court says, "to show the understanding of the bar and the bench down to that time." And yet, without any decision whatever contrary to the one made by this court when the question was first raised and argued before it, upon this mere "understanding" and assumption, and upon the action of mere administrative officers in classifying the laws for publication, that court deliberately disregards and sets aside the decision of this court upon a matter depending wholly upon the constitution and laws of this state.

In a still later case, *The City v. Lamson*, 9 Wall. 477, it disregarded a decision of this court holding void a provision in the charter of the city of Kenosha, because it conferred an unlimited power on the city to loan its credit. And the court professes to bring this within the doctrine of the other cases, by stating generally that, at the time the bonds were issued, "the decisions of the

court of the state favored the validity of the law." This is wholly untrue in point of fact. There was no prior decision or assumption by this court to the contrary of the one thus disregarded. The cases referred to by the reporter as supporting the statement of the court involved no such question. And, what is an equally significant fact in answer to the purpose for which they are here referred to, they were both made sometime after the bonds there involved were issued.

And in the case of *Butz v. The City of Muscatine*, 8 Wall. 575, that court openly repudiates its obligation to follow the state decisions upon state law, and declares that it will not follow them when they deprive parties of rights or remedies which they would have according to what the federal court thinks the proper construction of the law. The attempt to assimilate the question there presented with the class like *Bank v. Skelly*, 1 Black, 436, where the question is whether the state law impairs the obligation of a contract, or is itself a contract, seems utterly indefensible. And the case must stand as a distinct repudiation by the federal court of its obligation to follow the state decisions on questions purely of state law, when contrary to its own judgment.

If the supreme court of the United States has been influenced either by the praises sung by some interested counsel, or by his libels upon the people and judiciary of his state, contained in intimations that the latter were elected for purposes of repudiation, and made decisions to win popular favor, to assume a superior regard for the sanctity and inviolability of either public or private faith, and, in consequence, a guardianship over the judicial morals of the state courts in the administration of state law, it has committed a serious mistake, which, if persisted in, will lead inevitably to difficulty and disaster. For, however much the states may be disposed to acquiesce in the binding authority of its decisions upon federal law, it is not to be expected that they will permanently

submit to any attempt on its part to usurp the same high function in respect to questions depending wholly upon the constitutions and laws of the states themselves.

I have thus alluded to these decisions for the purpose of showing that the liability to collision and serious difficulties, growing out of differences of opinion in administering the same laws over the same territory and people, by two judicial systems, without a common arbiter, is not by any means sufficient to show conclusively that the framers of the constitution intended to provide such.

I cannot but regard the line of decisions to which I have referred as just cause for serious alarm on the part of the states, and of all the friends to the perpetuity of our system of government. I think the whole matter should be made the subject of a constitutional amendment, establishing and regulating with clearness and precision the appellate jurisdiction of the federal court upon questions of federal law, and protecting by a similar appeal, or otherwise if possible, the supremacy of the states as to the reserved powers.

I freely concede that the appellate jurisdiction as to federal questions would be naturally and appropriately vested in the supreme court of the United States, and inasmuch as it has been already so long asserted and exercised, and so generally acquiesced in, I would also, on grounds of policy and authority, now acquiesce in it, if I could feel that no more extreme measures would ever be resorted to in enforcing it than those which have hitherto been used. But because I can feel no such assurance, and because I regard the jurisdiction, in its present undefined and uncontrolled form, as a source from which great danger is ultimately to be apprehended, I have concluded to place on record my protest against it, almost solitary and wholly ineffectual though it be.

As the power of removal is only claimed as a branch of the appellate power, in the opinion of the supreme court in *Martin v. Hunter's Lessee* (1 Wheaton, 349), it follows, that, if the appellate jurisdiction does not exist, the power of removal falls with it, and the order appealed from should be affirmed.

*By the Court.* — The order of the circuit court is reversed, and the cause remanded with directions to grant the order of removal.

# JANUARY TERM, 1870.

| 25 | 167 |
| 77 | 118 |

| 25 | 167 |
| 80 | 463 |

| 25 | 167 |
| 85 | 425 |

| 25 | 167 |
| L93 | 650 |

| 25 | 167 |
| 95 | 159 |

| 25 | 167 |
| f112 | ² 10 |
| 56 LRA | 244 |

| 25 | 167 |
| 114 | ¹574 |

| 25 | 167 |
| 61 LRA | 347 |